IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TERRY MARUNDA, | 4:09CV3109 |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER ON REVIEW OF THE FINAL DECISION OF THE COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Now before me is Plaintiff Terry Marunda's complaint, filing 1, which the plaintiff filed pro se on May 27, 2009. The plaintiff seeks a review of the Commissioner of the Social Security Administration's decision to deny the plaintiff's applications for disability insurance benefits under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq., and Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The defendant has filed an answer to the complaint and a transcript of the administrative record. (See filings 7, 8.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., filing 13; Def.'s Br., filing 18.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

## I. BACKGROUND

The record indicates that the plaintiff protectively filed applications for disability insurance benefits and SSI benefits on July 14, 2005. (See Transcript of Social Security Proceedings (hereinafter "Tr."), filing 8, at 17.) After the applications were denied on initial review, (see id. at 32, 34-41), and on reconsideration, (see id. at 33, 42-49), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (id. at 50). This hearing was

1

held on March 18, 2008, (see id. at 642), and, in a decision dated July 25, 2008, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits or SSI benefits, (see id. at 17-25). In reaching this conclusion, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2004, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since August 1, 2003, the alleged onset date.

3. The claimant has the following severe impairments: peripheral vascular disease on the right status post repair of a left femoral artery dissection and lower extremity embolectomy and left posterior tibial ischemic mononeuropathy.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to occasionally lift and carry up to 20 pounds and 10 pounds frequently. The claimant can stand and sit for up to 6 hours in an 8 hour workday but needs to alternate sitting and standing hourly in order to achieve maximum comfort. He has unlimited use of his extremities. He needs to avoid exposure to astringents, fumes, gases, and odors.

    . . . .

6. The claimant is unable to perform any past relevant work.

    . . . .

7. The claimant was born on October 14, 1961, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

. . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2003 through the date of this decision.

(Tr. at 19-20, 23-25 (citations omitted).)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See Tr. at 12.) This request was denied, (see id. at 4-6), and therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On May 27, 2009, the plaintiff filed the instant action. (See Compl., filing 1.) The plaintiff asks that I "reverse the social security decision." (See id. at 5.)

## II. STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984). See also

Finch, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision. See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909. Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c). Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. §

416.920(a)(4)(iii). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). Step four requires the ALJ to consider the claimant's residual functional capacity[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f). Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).

"Through step four of this analysis, the claimant has the burden of showing that she is disabled." Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008). After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." Id. In this case, the ALJ reached step five of the sequential analysis and concluded that the plaintiff was not disabled. (See Tr. at 24-25.)

### III. SUMMARY OF THE RECORD

The plaintiff is a 48-year-old high school graduate who alleges that he has been disabled since August 2003 due to a blocked femoral artery in his right leg, nerve damage in his left foot, and carpal tunnel syndrome in his left wrist. (Tr. at 23, 80.) The parties emphasize the following aspects of the administrative record. (See Pl.'s Br., filing 13, at 1-3; Def.'s Br., filing 18, at 2-1.)

A medical record of the Omaha Veterans Administration Medical Center (VAMC) dated

---

[1] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

5

August 25, 2003, states that the plaintiff reported pain in both feet "primarily when he bears weight on them." (Tr. at 243.) The record notes that the plaintiff's foot pain "has been off and on for the last five years, but [is] worse lately when he has been on his feet for prolonged periods of time." (Id.) The plaintiff was referred "to Podiatry," (id.), and on October 29, 2003, the plaintiff appeared at the VAMC podiatry clinic for an evaluation, (id. at 241). The podiatry clinic record states that the plaintiff complained of "pain and burning type sensations" in the soles of both feet and that the "[c]ondition has become acutely sensitive since [his] taking on a second job where he is required to be on his feet for 12 to 14 hour workdays." (Id. at 241.) The plaintiff was diagnosed with "[p]lantar fasciitis, secondary to biomechanical fault, aggravated by extensive weightbearing," and the record describes the plaintiff's treatment plan as follows:

> The patient was explained the biomechanics of the flatfoot deformity and how it likely relates to his foot pain. He was advised that continued 14-hour workdays will likely keep this condition in a somewhat chronic state. The patient will begin the use of cold therapy to the bottoms of both feet, specifically after work and before bed and was instructed on specific stretching exercises for his arch and tight posterior leg muscles. He was referred to prosthetics for evaluation pertaining to custom orthotic devices. He will return as needed.

(Id.)

Approximately 1 year later, the plaintiff returned to the Omaha VAMC "with complaints of severe right sided knee pain for the last several weeks." (Tr. at 230.) A "very superficial" cyst, approximately one inch in diameter, was observed on the posterior of his right knee. (Id.) A "[s]urgical consult for removal of [the] cyst" and a "neoprene sleeve" were ordered. (Id. at 231.) The cyst was removed on November 30, 2004, and it was noted on December 13, 2004, that the incision was "healing well." (Id. at 224, 278.)

A record dated January 14, 2005, indicates that the plaintiff was "referred to Vascular Surgery due to a right lower extremity claudication as well as new onset of rest pain." (Tr. at 197.)² The plaintiff reported difficulty walking, stating that he could "walk approximately 1 block before experiencing pain in his right lower extremity." (Id.) He also stated that a burning pain in his right foot caused him to wake from his sleep. (Id.) The examiner determined that the

---

²Claudication "means limping or walking with difficulty." Stedman's Medical Dictionary 389 (28th ed. 2006) (internal quotation marks omitted).

plaintiff's claudication was "secondary to aorto-occlusive disease," and an "aortogram with bilateral runoff" was recommended. (Id. at 197-98.)

An aortogram performed on March 24, 2005, revealed "[s]mall caliber bilateral common iliac arteries," "[s]hort severe stenotic segment at the origin of the right internal iliac artery," and "[o]cclusion of the right external iliac artery with collateral vessels reconstituting the common oral artery just above the bifurcation." (Tr. at 260.) On March 29, 2005, the plaintiff reported to the emergency room at the Omaha VAMC with complaints of pain in his thigh and left groin. (Tr. at 202.) An examination revealed a clot in his superficial femoral artery that is described as a "complication" of the aortogram. (Id. at 157, 158, 202-03.) Emergency surgery was performed to repair the plaintiff's artery. (Id. at 158, 202-03.)

The plaintiff returned for follow-up care on April 13, 2005, and underwent "[l]eft groin exploration with evacuation of lymphocele" to address clear fluid that was leaking from the wound in his left groin. (Tr. at 157, 164, 270-71.) The plaintiff was discharged on April 22, 2005, and it was noted that his pain was "well controlled at this moment." (Id. at 157.)

During another follow-up on May 11, 2005, the plaintiff reported that he was walking well on his left leg without pain. (Tr. at 184.) He also reported, however, that his right leg "hurt him when he walks," and his "major complaint" was left hand pain that he attributed to an IV that had been placed in his forearm during his surgery. (Id.) The plaintiff was given pain medication for his left arm and encouraged to continue to walk and exercise as much as possible. (Id. at 184-85.)

On June 8, 2005, the plaintiff visited the emergency room with complaints of left foot pain and "some warm feeling in his entire left leg." (Tr. at 177.) An examination revealed good circulation in the leg, and the plaintiff was directed to follow up with the vascular clinic during a June 15 appointment. (Id. at 178.) During this June 15 appointment, the plaintiff reported that he continued to have leg pain but was otherwise doing well. (Id. at 171.) The plaintiff was started on medication for "possible neurologic pain" and scheduled for an appointment in the neurology clinic. (Id.)

On July 12, 2005, the plaintiff visited the neurology clinic and complained of pain and tingling in his left arm and a "pins and needles sensation" in the bottom of his left foot. (Tr. at

167.) He denied numbness and weakness, and an examination indicated that he had normal strength in his extremities and a normal gait. (Id. at 167-169.) Adjustments were made to his pain medication. (Id. at 169-70.) In a "Daily Activities and Symptoms Report" dated July 27, 2005, however, the plaintiff reported that he could only walk for half a block before stopping to rest his right leg and that he could only stand for ten to fifteen minutes due to the "nerve damage" in his foot. (Id. at 75.)

On September 1, 2005, David G. Rutz, M.D., performed a consultive examination of the plaintiff. (See Tr. at 294-303.) His diagnostic impression of the plaintiff included the following observations: 1) neuropathy of the left lower extremity, secondary as a complication of the embolectomy, that has resulted in severe hyperesthesia and dysesthesia of the sole of the left foot;[3] 2) atherosclerotic obstruction of the right femoral artery that causes claudication; and 3) carpal tunnel syndrome. (Id. at 300.)

An EMG consult note dated September 13, 2005, states that "electrophysiological studies of the upper and lower extremities showed evidence of an early right carpal tunnel syndrome involving the sensory fibers only and a left posterior tibial mononeuropathy as well." (Tr. at 310.) It adds, "The symptoms of pain in the left hand and left foot are suggestive of complex regional pain syndromes with superimposed left posterior tibial ischemic mononeuropathy." (Id.)[4]

The plaintiff visited the anesthesia pain clinic on September 22, 2005. (Tr. at 309.) He described the pain in his hand as "severe, burning in nature, and very sensitive to the point where cold or heat really bothers his first three fingers." (Id.) He wore a "glove on his hand at all times to keep the temperature the same so it does not hurt so much." (Id.) He also reported that "[h]is left lower extremity pain bothers him when he walks," and "[h]e has slipper type shoes that he

---

[3]Hyperesthesia is "[a]bnormal acuteness of sensitivity to touch, pain, or other sensory stimuli. Stedman's Medical Dictionary 920 (28th ed. 2006). Dysesthesia is an "[i]mpairment of sensation short of anesthesia" or "[a] condition in which a disagreeable sensation is produced by ordinary stimuli." Id. at 596.

[4]"Ischemic" refers to a loss of blood supply due to an obstruction of a blood vessel. Stedman's Medical Dictionary 1001 (28th ed. 2006). Mononeuropathy is a "[d]isorder involving a single nerve." Id. at 1224.

8

wears because that helps his pain." (Id.) His medications were continued, and the examiner added a prescription for a Lidoderm patch. (Id. at 309-10.)

On September 26, 2005, Jerry Reed, M.D., made two Physical Residual Functional Capacity Assessments of the plaintiff. (Tr. at 135-154.) One of these is "current," (see id. at 135-42), and the second covers "a period of time up to March 31, 2004," (id. at 143, 147-54). In the assessment covering the period up to March 31, 2004, Dr. Reed opined that the plaintiff had no exertional or postural limitations and no severe symptoms. (Id. at 147-54.) In connection with the "current assessment," Dr. Reed disagreed with Dr. Rutz's diagnosis of carpal tunnel syndrome, stating that although the plaintiff alleges that he suffers from it, that diagnosis is not established "on the basis of the medical record." (Id. at 144.) He also "question[ed] the credibility of the claimant" based on inconsistencies in the record and allegations of pain that "is much worse than what has been described previously." (Id. at 145.) Dr. Reed found that the plaintiff was currently limited to lifting 20 pounds occasionally and 10 pounds frequently, was able to stand or walk for at least 2 hours in an 8-hour workday, and was able to sit for about 6 hours in an 8-hour workday. (Id. at 136.) He also found that the plaintiff could only occasionally balance, stoop, kneel, crouch, or crawl. (Id. at 137.) The plaintiff raises several objections to Dr. Reed's assessment; these will be addressed in Part IV below.

The plaintiff visited the pain clinic on November 18, 2005, for a follow-up concerning his "left-sided neuropathic pain." (Tr. at 308.) He reported that his medications were "continuing to help." (Id.) A TENS unit was requested for him to use for additional pain relief. (Id.)[5]

The plaintiff visited the vascular clinic for a follow-up on December 14, 2005, and he reported that "his left extremity pain has greatly decreased." (Tr. at 304.) He did complain, however, "of persistent claudication of his right leg" that required him to stop and rest "for a couple of minutes" after walking "half a block or a couple of flights of stairs." (Id.) Surgical intervention was to be considered, and the plaintiff was advised to "continue to try to stop smoking and [to] exercise as much as possible." (Id.)

On March 23, 2006, the plaintiff underwent a right iliofemoral bypass procedure. (Tr. at

---

[5]TENS is an "[a]bbreviation for transcutaneous electrical nerve stimulation." Stedman's Medical Dictionary 1946 (28th ed. 2006).

9

362.) He returned for wound debridement on April 5, 2006, "was admitted for dressing changes and antibiotics," and was discharged on April 9, 2006. (Id. at 361.) Records indicate that he healed well from the procedure. (See id. at 468, 470.) An examination on June 26, 2003, revealed "no evidence of deep venous thrombosis," normal venous flow characteristics in both legs, and normal arterial flow. (Id. at 415-16.)

On August 17, 2006, the plaintiff visited the pain clinic with complaints of pain in his left leg and left hand. (Tr. at 462.) It was noted that he walked "slowly with normal appearing gait," and that he had a two-centimeter nodule on his left wrist. (Id.) Adjustments were made to the plaintiff's medication regimen, and he was started on methadone to "have him try and wean off of the oxycodone." (Id.)

The plaintiff returned to the plain clinic for a follow-up on or about October 19, 2006. (Tr. at 460-61.) He stated that his leg pain was "fairly well managed" with medication; he was concerned about the "mass" in his left wrist, though he said that it was "not terribly painful"; and he was "having some vague left arm pain," though no pain was observed during the examination. (Id. at 461.) The plaintiff was continued on methadone, an x-ray of the wrist was ordered, and the plaintiff was referred to "the orthopedic hand surgeon for a possible excision" of the wrist mass. (Id.)

On March 26, 2007, the plaintiff returned to the plain clinic for another follow-up. (Tr. at 430.) "He state[d] that he feels like the Methadone is not providing him with pain relief for a long enough period of time." (Id.) More specifically, he reported "that one pill works for about 8 hours and then he is in excruciating pain." (Id.) He added that he was having trouble sleeping. (Id.) The progress note also indicates that the plaintiff wanted "to continue to try conservative therapy" for his wrist. His medications were continued, but with some adjustment. (Id. at 431.)

On June 26, 2007, a vascular lab study revealed no deep venous thrombosis, and venous and arterial flow in the plaintiff's legs was normal. (Tr. at 416.)

The plaintiff visited the orthopedic clinic on August 3, 2007, with complaints of numbness and tingling in some of the fingers of his left hand. (Tr. at 405.) He stated that these sensations arose when the cyst on his wrist increased in size. (Id.) He was scheduled for surgery to have the cyst removed on November 2, 2007. (Id.)

On August 15, 2007, the plaintiff visited the vascular clinic with complaints of increased leg pain during the previous eight weeks. (Tr. at 402.) He denied back pain, but he described the leg pain "as originating in the buttock with radiation down the left posterior extremity." (Id.) The examining physician opined that the pain was neurologic rather than vascular in origin, and he recommended further study and follow-up. (Id. at 403.)

On October 29, 2007, the plaintiff reported to the primary care clinic with complaints of left leg pain. (Tr. at 380.) He stated that he was "[i]n a lot of pain," was "[u]nable to sleep," and was "[b]etter standing up." (Id.) His dosage of methadone was increased, and percocet was added to his medication regimen. (Id. at 380-81.)

On November 2, 2007, the cyst on the plaintiff's left wrist was removed. (Tr. at 515-16.) He was discharged with instructions to wear a splint for the ensuing two weeks. (Id. at 516.) On November 13, 2007, he returned for a follow-up and reported no problems with his splint or his incision. (Id. at 556.)

A progress note dated November 15, 2007, indicates that the plaintiff's pain medication was effective, that his pain was better during the past month, that his pain was "manageable," and that he had not used any oxycodone. (Tr. at 554.)

An orthopedic clinic note dated December 14, 2007, states that the plaintiff's wrist incision was well-healed, and there was no sign of recurrence of the cyst. (Tr. at 366-67.) The plaintiff had some tenderness along the incision, but he had full range of motion in his wrist and digits. (Id. at 367.)

The plaintiff returned to the pain clinic for evaluation on January 23, 2008. (Tr. at 365.) The progress note states that the plaintiff was "doing quite well on his current pain medicines," and he was in "no acute distress." (Id.) He was instructed to follow up with his primary care provided for his pain medications. (Id. at 366.)

A record dated February 4, 2008, indicates that the plaintiff's current pain medication was effective and that on average, he did not take any daily medication for "breakthrough pain." (Tr. at 544.)

A hearing was held before an ALJ on March 18, 2008. (Tr. at 642.) During this hearing, the plaintiff testified that he stopped working in August 2003 due to problems with his legs and

feet. (Id. at 652.) He testified that his left leg makes it hard for him to sit in one spot for long; he cannot stand or walk very far; and he cannot get comfortable in any position when he sleeps. (Id. at 666.) He also testified, "It's manageable pain for the most part but there are times that it is just unbearable." (Id.; see also id. at 670 (reporting the plaintiff's testimony that his pain has been manageable with medication since May 2005, except for some "bad days").) The plaintiff added that he has been told that he will not be hired while he continues to take methadone. (Id. at 663, 673, 681-82.) He described being discharged from the Navy due to his development of an allergic reaction to fuel oils. (Id. at 656, 679.) He estimated that in he could sit for "[a] good 30-40 minutes" in certain chairs and that he could stand for about 30 minutes. (Id. at 667.) He also testified that he could lift 20 pounds comfortably. (Id. at 669.)

A Vocational Expert (VE) also testified at the March 18 hearing. (Tr. at 673-81.) The ALJ asked the VE the following question:

> [L]et's assume for the first . . . hypothetical that such a person could lift up to 20 pounds on occasion, ten pounds on a frequent basis, could in an eight-hour day sit for six hours and stand for six hours and had unlimited use of the extremities but during that time period would have needed to maybe have slightly more periods of being able to sit or stand than normal instead of having to be in one position for two hours before a break, let[']s say on one hour basis would have to be given, or allowed to change position. And that such person should have also stayed away from [or] avoided exposure to astringents, fumes and so forth that apparently has [sic] made him break out in the past. . . .
>   . . . .
> Would there have been other work in the regional or national economy that one could do with those limitations?

(Tr. at 675.) In response, the VE testified that a person with these limitations could perform light work as a battery tester, file clerk, and order clerk. (Id. at 675-77.)

On July 25, 2008, the ALJ decided that the plaintiff "has not been under a disability, as defined in the Social Security Act, from August 1, 2003 through the date of this decision." (Tr. at 25.)

### IV.  ANALYSIS

In his brief, which the plaintiff filed pro se, the plaintiff argues that the Commissioner's decision "cannot be considered true and accurate" to the extent that it is "made from the two erroneous Physical Assessment reports" completed by Dr. Jerry Reed. (Pl.'s Br., filing 13, at 3.)

12

This is so, he argues, because Dr. Reed's assessment is inaccurate in several respects: 1) the plaintiff cannot, in fact, "occasionally lift and/or carry 20 pounds"; 2) he cannot frequently "lift and/or carry" 10 pounds; 3) he cannot stand or walk for a total of at least two hours in an eight-hour workday; 4) he cannot sit for a total of six hours in an eight hour workday; 5) he cannot push and pull without limitation due to his pain; 6) he cannot climb, balance, stoop, kneel, crouch, or crawl "occasionally," as Dr. Reed indicated; 7) he has visual limitations that Dr. Reed did not recognize, as demonstrated by the fact that he (the plaintiff) wears glasses; 8) the nerve damage in his left hand limits his ability to be exposed to extreme cold and extreme heat; and 9) he cannot bear unlimited exposure to noise. (Id. at 1-2.) In addition, the plaintiff attributes to Dr. Reed an opinion that the plaintiff should have ignored an "infected bone in [his] left ear . . . just because [he] also had a vascular problem," and he submits that he has not "met any other doctor who feels that way." (Id. at 3.) He also questions the fact that Dr. Reed completed two different assessments on the same day "with two different findings." (Id.)[6]

In response to the plaintiff's arguments, the defendant notes–correctly–that the ALJ did not adopt Dr. Reed's opinions when assessing the plaintiff's RFC. (Def.'s Br., filing 18, at 11 n.2. See also Tr. at 19-23 (setting forth the ALJ's RFC findings and the foundation for those findings).) Nevertheless, the defendant construed the plaintiff's brief as raising an indirect challenge to the ALJ's RFC assessment, and it responded to the plaintiff's brief accordingly. (See Def.'s Br., filing 18, at 11 n.2, 12-16.)

I find that the pertinent question is not whether fault can be found with Dr. Reed's particular assessment, but whether the ALJ's RFC assessment is supported by substantial evidence. Also, I agree with the defendant that the plaintiff's brief can, and should, be construed liberally as raising a challenge to the ALJ's RFC assessment. I shall therefore proceed to analyze whether the ALJ's RFC findings are based on substantial evidence in the record.

"The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own descriptions of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quoting

---

[6]As noted above, the two assessments focused on the plaintiff's RFC at different time periods, even though they were completed on the same date.

Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)). After carefully reviewing the relevant evidence, I find that the ALJ's RFC assessment is supported by substantial medical evidence.

First, I note that the plaintiff's treating physicians found that the plaintiff had normal strength and range of motion in his extremities, (e.g., Tr. at 167-69, 171, 402, 462), and the plaintiff testified that he could lift 20 pounds comfortably, (id. at 669). (See also id. at 22, 23 (noting plaintiff's normal strength and range of motion and ability to lift 20 pounds).) Thus, the lifting and carrying restrictions assessed by the ALJ are well-supported by the record. The record also supports the ALJ's finding that the plaintiff can stand or sit for up to six hours in an eight-hour workday, as long as he has the freedom to alternate between sitting and standing every hour. More specifically, the records and testimony indicate that although the plaintiff has had a number of surgical procedures performed, his pain has been manageable with medication since approximately May 2005. (E.g., Tr. at 308, 365, 513, 670.) Also, aside from an October 2003 record stating that the plaintiff should not continue to spend fourteen-hour workdays on his feet, the plaintiff's physicians did not place restrictions on his activities. (See id. at 23 (noting that none of the treating sources indicated that the plaintiff was unable to work).) On the contrary, records indicate that the plaintiff was often advised to increase his physical activity. (E.g., Tr. at 185, 304, 479, 488, 512.) See Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) ("A lack of functional restrictions on the claimant's activities is inconsistent with a disability claim were, as here, the claimant's treating physicians are recommending increased physical exercise."). The ALJ's RFC also properly accounted for the requirement that the plaintiff not be exposed to "astringents, fumes, gases, and odors" due to his reaction to exposure to fuel oils. In light of the foregoing, I cannot say that the RFC determined by the ALJ is insufficient or lacking in foundation.

It is true that the ALJ's RFC assessment differs from the plaintiff's self-reported limitations. As noted above, the plaintiff testified that he could sit for only "[a] good 30-40 minutes" in a proper chair[7] and that he could stand for only "30 minutes or so." (Tr. at 667.) The ALJ found, in contrast, that the plaintiff "needs to alternate sitting and standing hourly in order to

---

[7]In his interrogatory responses, the plaintiff reported that "depending on the style of the chair," he could sit for "5 min to 1 hour" before he must stand up or lie down. (Tr. at 109.)

achieve maximum comfort." (Id. at 19-20.) This discrepancy does not require a reversal of the Commissioner's decision in this case, however. An ALJ may reject a claimant's subjective complaints if he makes "an express credibility determination explaining the reasons for discrediting the complaints." Moore, 572 F.3d at 524 (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The ALJ is not required to discuss each of these factors explicitly, however. Id. "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (citation omitted). In this case, the ALJ discussed the plaintiff's daily activities, (Tr. at 20, 22), the intensity and frequency of the plaintiff's pain, (id. at 20, 22, 23), the factors that cause and contribute to his pain, (id. at 20), the effectiveness of the plaintiff's medication, (id. at 20, 23), the absence of functional restrictions imposed by physicians, (id. at 23), and the plaintiff's work history, (id. at 20), when evaluating the plaintiff's credibility. He also explained that although the plaintiff's complaints were supported by objective medical evidence, they appeared "exaggerated" when considered in relation to that evidence. (Id. at 21-23.) In light of the foregoing, it is clear that the ALJ's decision to afford limited credibility to the plaintiff's testimony was not erroneous.

In summary, I find that the ALJ's RFC determination was supported by substantial medical evidence, and the ALJ properly discredited the plaintiff's testimony concerning his own limitations. The plaintiff's argument that Reed's assessment contains several errors does not alter this conclusion.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated May 26, 2010.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge